IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 06-cv-01467-WDM-CBS

FRED RAYNEL LUCERO,
      Plaintiff,
v.

STAN HILKEY, Mesa County Sheriff,
STEVEN FARLOW, Commander,
JIM WESTERMEYER, Sheriff Deputy, and
KEVIN MCCABE, Sheriff Deputy,
      Defendants.
_____

RECOMMENDATION AND ORDER OF UNITED STATES MAGISTRATE JUDGE
_____

Magistrate Judge Craig B. Shaffer

      This civil action comes before the court on: (1) "Defendants' Motion for Summary Judgment" (filed June 29, 2007) (doc. # 118); (2) Plaintiff Lucero's "Motion to Amend Prisoner Complaint" (filed September 19, 2007) (doc. # 143); (3) "Plaintiff's Motion to Supplement Legal Authority Regarding Plaintiff's Verified Response to Motion for Summary Judgment" (filed September 19, 2007) (doc. # 144); and (4) "Defendants' Motion for Summary Judgment Against Amended Prisoner Complaint" (filed October 5, 2007) (doc. # 150). Pursuant to the Order of Reference dated October 5, 2006 (doc. # 13) and the memoranda dated July 2, 2007 (doc. # 120), September 20, 2007 (doc. # 145), and October 9, 2007 (doc. # 152), these matters were referred to the Magistrate Judge. The court has reviewed the Motions, the parties' Responses filed August 23, 2007 (doc. # 138), October 3, 2007 (doc. # 147), October 4, 2007 (doc. # 149), and October 26, 2007 (doc. # 157), the parties' Replies filed September 6, 2007 (doc. # 140), October 16, 2007 (doc. # 154), and November 12, 2007 (doc. # 158), the exhibits and affidavits, the entire case file, and the applicable law and is sufficiently advised in the premises.

I.    Statement of the Case

Mr. Lucero is currently incarcerated at the Sterling Correctional Facility of the Colorado Department of Corrections ("CDOC") in Sterling, Colorado. Related to his attendance at a hearing on April 24, 2006 in the state district court, Mr. Lucero was temporarily incarcerated from April 19, 2006 to April 26, 2006 at the Mesa County Detention Facility ("MCDF") in Grand Junction, Colorado. (*See* Complaint (doc. # 3) at p. 5 of 26).[1] Mr. Lucero alleges three claims pursuant to 42 U.S.C. § 1983 that he was exposed to conditions at MCDF that constituted deliberate indifference to his serious medical needs, health, and safety in violation of the Eighth Amendment to the United States Constitution. (*See* doc. # 3 at pp. 4-13 of 26; doc. # 142 at pp. 1-3 of 13). Mr. Lucero alleges: (1) that he "received serious injuries" when his medical restrictions were ignored and while he was "double-celled" at MCDF, in violation of his Eighth Amendment rights; (2) that he "received carbon monoxide poisoning on April 26, 2006, while being transported by the defendants," in violation of his Eighth Amendment rights; and (3) that he was subjected "to extreme heat conditions without adequate ventilation" while being transported by the defendants on April 26, 2006, in violation of his Eighth Amendment rights. (*See* doc. # 3 at pp. 4-12 of 26; doc. # 142 at pp. 1-3 of 13). Mr. Lucero seeks injunctive relief as well as compensatory, nominal, and punitive damages. (*See* doc. # 3 at p. 15 of 26). Defendants have moved for summary judgment on all of Mr. Lucero's claims.


II.    Defendants' Motion for Summary Judgment

A.    Standard of Review

The purpose of summary judgment is to determine whether trial is

_____

[1]    The operative Amended Complaint, accepted for filing on September 11, 2007 (*see* doc. # 141), consists of the original "Prisoner Complaint" (doc. # 3) and the "Amended Prisoner Complaint" (doc. # 142).

> necessary. Summary judgment is appropriate under Fed.R.Civ.P. 56(c) when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. The movant bears the initial burden to point to those portions of the record that demonstrate an absence of a genuine issue of material fact given the relevant substantive law. If this burden is met, the nonmovant must come forward with specific facts showing that there is a genuine issue for trial as to elements essential to the nonmovant's claim. The nonmovant has the burden to show that there are genuine issues of material fact to be determined. The court views the evidence of record and draws all reasonable inferences in the light most favorable to the nonmovant. To defeat a properly supported motion for summary judgment, there must be evidence upon which the jury could reasonably find for the plaintiff. Conclusory allegations will not create a genuine issue of material fact necessitating trial.

*Dobson v. City and County of Denver*, 81 F. Supp. 2d 1080, 1083 (D. Colo. 1999) (internal quotation marks, citations and brackets omitted).

As Mr. Lucero has submitted his Complaint and Responses sworn under penalty of perjury (*see* doc. # 3 at p. 15 of 26; doc. # 138 at p. 18 of 18; doc. # 157 at p. 10 of 20), the court may treat them as affidavits. *Green v. Branson*, 108 F.3d 1296, 1301 n. 1 (10th Cir. 1997). *See also Conaway v. Smith*, 853 F.2d 789, 792 (10th Cir. 1988) ("Although a nonmoving party may not rely merely on the unsupported or conclusory allegations contained in his pleadings, a verified complaint may be treated as an affidavit for purposes of summary judgment if it satisfies the standards for affidavits set out in Rule 56(e).").

"Rule 56(e) requires that the affidavit be based on personal knowledge, contain facts which would be admissible at trial, and show that the affiant is competent to testify on the matters stated therein." *Conaway*, 853 F.2d at 792. Where the court treats a verified complaint as an affidavit, whether a party's affidavit in opposition to summary judgment is "sufficient to create a genuine issue of material fact must be evaluated in light of the principle that 'conclusory allegations without specific supporting facts have no probative value.' " *Nichols v. Hurley*, 921 F.2d 1101, 1113 (10th Cir. 1990) (quoting *Evers v. General Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985)). "[T]here may be cases where the sole reliance on a verified complaint would be insufficient to meet a nonmoving

party's burden . . . , especially when the allegations contained in the pleading are merely conclusory." *Conaway*, 853 F.2d at 792-93. An affidavit merely stating conclusory allegations is insufficient to withstand a defendant's properly supported motion for summary judgment. *See Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 884 (1990) (quoting Fed. R. civ. P. 56(e) ("When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading")). The court must determine whether Mr. Lucero has met his burden of presenting specific facts to overcome Defendants' Motions for Summary Judgment.

B.      Analysis

Title 42 U.S.C. § 1983 provides a civil cause of action for individuals who are deprived of "any rights, privileges, or immunities secured by the Constitution and laws" by a person acting "under color of law." *Adickes v. SH Kress & Co.*, 398 U.S. 144, 147, 150 (1970). Section 1983 does not create any substantive rights; rather, it creates only a remedy for violations of rights secured by federal statutory and constitutional law. *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 616-18 (1979).

"[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (citation omitted). The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. CONST. Amend. VIII. Certain conditions of confinement, if they inflict pain unnecessarily and wantonly, may constitute cruel and unusual punishment under the Eighth Amendment. *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

1.      Eighth Amendment

Under the Eighth Amendment, "prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.' " *Farmer*, 511 U.S. at 832 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)). *See also Barney v. Pulsipher*, 143 F.3d 1299, 1310 (10th Cir. 1998) ("Prison officials are required to provide humane conditions of confinement by ensuring inmates receive the basic necessities of adequate food, clothing, shelter, and medical care and by taking reasonable measures to guarantee the inmates' safety.").

An Eighth Amendment claim includes both an objective component, whether the deprivation of a basic human need is sufficiently serious, and a subjective component, whether the officials acted with a sufficiently culpable state of mind. *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). As for the objective component,

> extreme deprivations are required to make out a conditions-of-confinement claim. Because routine discomfort is "part of the penalty that criminal offenders pay for their offenses against society, only those deprivations denying 'the minimal civilized measure of life's necessities' are sufficiently grave to form the basis of an Eighth Amendment violation."

*Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (citations omitted). Thus, in a conditions-of-confinement case, a "sufficiently serious" deprivation is shown when "a prison official's act or omission . . . result[s] in the denial of 'the minimal civilized measure of life's necessities.'" *Farmer*, 511 U.S. at 834 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).

The subjective component follows from the principle that "'only the unnecessary and wanton infliction of pain implicates the Eighth Amendment.'" *Farmer*, 511 U.S. at 834 (quoting *Wilson*, 501 U.S. at 297). The "deliberate indifference" subjective standard applies to claims of inhumane conditions of confinement. *Wilson*, 501 U.S. at 303-04. A finding of deliberate indifference requires a showing that the defendant "knows of and

disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. Under

this standard, "the official must both be aware of facts from which the inference could be

drawn that a substantial risk of serious harm exists, and he must also draw the inference."

*Farmer*, 511 U.S. at 837.


2.      Mr. Lucero's Claim One

In Claim One, Mr. Lucero alleges that double-celling and other conditions at MCDF

violated his Eighth Amendment rights. Mr. Lucero names only Defendants Hilkey and

Farlow in this claim. Mr. Lucero has summarized his claim:

> I was housed in the Cedar Section of the Mesa County Detention Facility
> between April 19, 2006, through April 26, 2006. I was housed with another
> inmate in a cell that was not designed for two beds because it only left
> approximately 25 square feet of walking space, compounded by the fact that
> there is less than 8" of walking space between the two beds. As the result,
> I repeatedly fell and injured myself repeatedly each time that I attempted to
> walk through the restricted space between both beds, I made repeated
> attempts to be moved to an end cell and informed Officer Carpenter and
> Sargeant [sic] Gonzales of my repeated falls and injuries. The Mesa County
> Sheriff's Office and its staff is well aware that I suffer from neck and back
> injuries and require bottom bunk and bottom bunk restrictions. I was housed
> on the second tier of Cedar Section and forced to climb stairs. Staff had
> actual knowledge of impending harm to my health and safety that was easily
> preventable, and failed to take any sort of corrective action to correct the
> problem.

(doc. # 3 at p. 4 of 26) (internal quotation marks omitted).


a.      Objective Component of Eighth Amendment Claim

As to the objective component of his Eighth Amendment claim, Mr. Lucero has not

demonstrated that the conditions deprived him of "the minimal civilized measure of life's

necessities," or at least a "single, identifiable human need." *Wilson*, 501 U.S. at 298

(citing *Rhodes*, 452 U.S. at 347).

The allegation of double-celling alone does not state a violation of the Eighth

Amendment prohibition against cruel and unusual punishment. It is well established that

double-celling is not unconstitutional per se. *See Rhodes*, 452 U.S. at 337 (rejecting an Eighth Amendment challenge based on double-celling of inmates in cells measuring approximately 63 square feet). In order to allege a constitutional violation based on double bunking, a prisoner must allege that the double bunking subjected him to the unnecessary or wanton infliction of pain or lead to a deprivation of essentials such as safety or sanitation. *See Rhodes*, 452 U.S. at 348 (Where it has not impacted "essential food, medical care, or sanitation" or "increase[d] violence among inmates or create[d] other conditions intolerable for prison confinement" or cause[d] deprivations of other programs such as work and education, double bunking does not violate the Constitution.).

Mr. Lucero has not produced any evidence that MCDF was unconstitutionally overcrowded, or that double-bunking affected any other aspect of jail life, such as plumbing, showers, fire safety, or levels of violence. *See, e.g., Tillery v. Owens*, 907 F.2d 418, 427-28 (3d Cir. 1990) (considering totality of circumstances of double-celling); *North v. White*, 152 Fed. Appx. 111 (3d Cir. 2005) (finding no Eighth Amendment violation where, due to a temporary influx of inmates, facility resorted to triple-celling of one-third of inmates for a month, since facility was otherwise well maintained; and ventilation, light, sanitation and food met applicable minimal standards), *cert. denied*, 126 S.Ct. 2036 (2006). *Smith v. Crose*, 2006 WL 2591075 * 7 (D.N.J. 2006) (placement in a cell designed for two but containing four beds not cruel and unusual punishment).[2]

"An important factor in determining whether conditions of confinement meet constitutional standards is the length of the incarceration." *Barney*, 143 F.3d at 1311. A "filthy, overcrowded cell and a diet of 'grue' might be tolerable for a few days and intolerably cruel for weeks or months." *Hutto v. Finney*, 437 U.S. 678, 686-87 (1978). "Courts have repeatedly held that similar and far worse conditions fail to state a claim

---

[2] Copies of these unpublished opinions are attached to this Recommendation and Order.

7

because of the brief nature of the incarceration." *Barney*, 143 F.3d at 1311 (citing *Whitnack v. Douglas County*, 16 F.3d 954, 958 (8th Cir.1994) (deplorably filthy and patently offensive cell with excrement and vomit not unconstitutional because conditions lasted only for 24 hours); *White v. Nix*, 7 F.3d 120, 121 (8th Cir.1993) (eleven day stay in unsanitary cell not unconstitutional because of relative brevity of stay and availability of cleaning supplies); *Harris v. Fleming*, 839 F.2d 1232, 1235-36 (7th Cir.1988) (five day stay in "filthy, roach-infested cell" not unconstitutional); *Ogbolu v. McLemore*, 1997 WL 49449, at *2 (10th Cir. Feb.7, 1997) (cold, wet, drafty, and unsanitary solitary cell for two days does not violate Eighth Amendment)). Mr. Lucero was double-celled for only seven days, from April 19, 2006 to April 26, 2006. (*See* doc. # 3 at p. 4 of 26). Mr. Lucero was permitted to leave his cell for four hours per day. (*See* doc. # 3 at p. 6 of 26 ¶ 7.b. ("20 hours of lockdown per day")). Mr. Lucero's allegations simply do not rise to the level of a constitutional violation.

As only extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim regarding conditions of confinement, *see Hudson*, 503 U.S. at 9, "[i]n order to demonstrate such an extreme deprivation, a prisoner must produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions and that a substantial risk of serious harm results from the prisoner's unwilling exposure to the challenged conditions." *Rish v. Johnson*, 131 F.3d 1092, 1096 (4th Cir. 1997) (internal quotation marks and citations omitted). Mr. Lucero does not point to any specific human need affected by the conditions of the double cell. *See Wilson*, 501 U.S. at 305 (general "amorphous" conditions of confinement do not "rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists."). Rather, Mr. Lucero alleges that he tripped and fell on four occasions and injured himself. (*See* Mr. Lucero's Response (doc. # 138) at p. 7 of 18).

Claims of § 1983 liability may not be predicated on negligence. *See Daniels v.*

8

*Williams*, 474 U.S. 327, 330, 106 S. Ct. 662 (1986) (holding that inmate who slipped on a pillow negligently left on a stairway by sheriff's deputy failed to allege a constitutional violation). *See also Medina v. City and County of Denver*, 960 F.2d 1493, 1500 (10th Cir. 1992) ("negligence and gross negligence do not give rise to section 1983 liability"). At most, Mr. Lucero alleges that MCDF personnel were negligent in their duty to protect him from hazardous conditions. Such an allegation is insufficient to state claim under the Eighth Amendment. *See Reynolds v. Powell*, 370 F.3d 1028, 1031 (10th Cir. 2004) ("Simply put, "[a] 'slip and fall,' without more, does not amount to cruel and unusual punishment. . . ."). Mr. Lucero's claim that he fell in his cell on four occasions suggests nothing more than a lack of due care in the nature of negligence and thus fails to state a cognizable claim under 42 U.S.C. § 1983.

Mr. Lucero argues that double bunking at MCDF led to injury to him. Specifically, Mr. Lucero alleges that the "walking space between the two beds" caused him to fall and injure himself. Mr. Lucero must produce sufficient evidence for a finder of fact to conclude that double-bunking created an unreasonable risk of serious damage to his health, *Helling v. McKinney*, 509 U.S. 25, 35 (1993), and that Defendants deliberately disregarded that risk, *McKinney*, 509 U.S. at 36.

The cell in which Mr. Lucero was housed is six feet wide and twelve feet six inches long, with a built-in bed six feet four inches long by two feet six inches wide, a built-in desk 36 inches by 15 and ½ inches, an attached stool, and a toilet and sink, all attached to the walls. (*See* Plaintiff's Exhibit 1 (doc. # 119-2 at p. 9 of 11); Affidavit of Steve Farlow (doc. # 119-2) at p. 3 of 11). In order to accommodate the jail population, portable beds are used. (*See* Affidavit of Steve Farlow (doc. # 119-2) at p. 3 of 11; *see also* doc. # 119-2 at pp. 10-11). "Based on the manufacturer's dimensions for the portable bed, the outside dimension for the base of the bed is 32 inches, or 2 foot, 8 inches. When [the portable bed was] placed on the floor and against the wall of the cell," there was a passage width of 10

inches.  (*See* Affidavit of Steve Farlow (doc. # 119-2) at p. 3 of 11).

In support of his claim, Mr. Lucero submits the affidavits of inmates Bryan Lemay, Jerome Hall Jr., David Weyers, Timothy Radloff, Adam Hendricks, Johnny Oxenford, Manuel Sepulveda, Deitrich Franz Bostelman, and Scott Bradley.  (*See* doc. # 139 at pp. 16-24, 27-28, 36-41 of 41).   These affidavits may not properly be used to defeat Defendants' summary judgment motion.

The affidavits of inmates Jerome Hall Jr., Timothy Radloff, and Adam Hendricks contain merely hearsay evidence that Mr. Lucero was injured due to double-bunking at MCDF.  (*See* doc. # 139 at p. 17 of 41 ("I asked Fred [Lucero] how he had hurt his left leg and left hip and he told me that he was forced to double bunk with another inmate while at Mesa County in a cell where there were less than eight inches of walking space between the beds and that he had repeatedly fell while trying to get through the constricted space between the beds . . . ;" doc. # 139 at p. 21 of 41 (". . . I asked him what was wrong with his leg.  Fred [Lucero] stated to me that he had injured it while being housed at the Mesa County Detention Facility, while trying to maneuver between a narrow gap between the two beds in the cell . . . ;" doc. # 139 at p. 23 of 41 ("I asked Fred [Lucero] how he had injured his left leg.  Fred responded by telling me that he had fallen about four times while at the Mesa County Detention Facility while trying to get through a narrow gap between the two beds in the cell and that he had injured his left hip and left knee as well as his wrist")).   "In order to survive summary judgment, the content of the evidence that the nonmoving party points to must be *admissible*." *Adams v. American Guarantee and Liability Ins. Co*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citation omitted) (emphasis in original). "Hearsay testimony that would be inadmissible at trial cannot be used to defeat a motion for summary judgment because a third party's description of a witness' supposed testimony is not suitable grist for the summary judgment mill." *Adams*, 233 F.3d at 1246 (internal quotation marks and citations omitted). *See also Starr v. Pearle Vision, Inc.*, 54 F.3d 1548,

1555 (10th Cir. 1995) (holding that "Rule 56 precludes the use of inadmissible hearsay testimony in depositions submitted in support of, or in opposition to, summary judgment."). *See also Zwygart v. Board of County Commissioners of Jefferson County, Kansas*, 483 F.3d 1086, 1092-93 (10th Cir. 2007) ("As double hearsay -- Mr. Zwygart said that his cardiologist said -- this passage is inadmissible under Fed.R.Evid. 802 and therefore 'not sufficient to defeat a motion for summary judgment'") (citation omitted).

The affidavits of inmates Johnny Oxenford, Manuel Sepulveda, and Dietrich Franz Bostelman addressed their experiences in MCDF in 1998 to 1999, 1998 to 2000, 2001 to 2002, and 2003 to 2004. (*See* doc. # 139 at pp. 27-28, 36-39 of 41). Because their personal knowledge ended at least two years prior to the time period relevant to Mr. Lucero's claim, these affidavits may not properly be used to defeat Defendants' summary judgment motion. *See, e.g.*, *Cherry v. Ritenour School District*, 253 F. Supp. 2d 1085, 1095 (E.D. Mo. 2003) (evidence from 1999-2000 was too remote from 2001 conduct).

The affidavit of inmate David Weyers, indicating merely that he did not observe Mr. Lucero limping before April 18, 2006 and that he observed Mr. Lucero limping after April 27, 2006, is not probative of Mr. Lucero's Eighth Amendment claim. The affidavit of inmate Scott Bradley states no more than Mr. Lucero's affidavit: that he tripped and fell on several occasions and injured himself. (*See* doc. # 139 at p. 40 of 41). The evidence that another inmate tripped and fell does not transform double-celling into anything more than a negligent condition that is not cognizable under § 1983. Mr. Bradley's statement that double-celling "certainly violates the Eighth Amendment" is conclusory and without adequate supporting facts to have probative value.

Mr. Lucero has not presented sufficient evidence from which a finder of fact could conclude that inmates generally were subjected to a substantial risk of serious harm from double-bunking. A factfinder could not conclude that double-bunking is unconstitutional based upon Mr. Lucero's evidence that he tripped and fell four times at MCDF, that he told

other inmates he had fallen four times, that other inmates later observed him limping, and that other inmates had fallen in their cells in past years.

Mr. Lucero also initially alleged that he was housed on the second tier of the jail and required to carry his bedding and clothing to his cell in violation of his housing and medical restrictions and in violation of his Eighth Amendment rights. (*See* doc. # 3 at p. 6 of 26). Mr. Lucero conclusorily alleges that the bundle of bedding and clothes weighed "approximately 50 lbs." (*See* doc. # 3 at p. 6 of 26). The evidence indicates that the bundle weighed 21 pounds. (*See* Affidavit of Steve Farlow (doc. # 119-2) at p. 5 of 11). Mr. Lucero represents that he was subject to a medical restriction that he not lift over 10 pounds. However, Mr. Lucero's evidence indicates that his medical restriction commenced on January 9, 1997 and expired on January 9, 1998. (*See* doc. # 139 at p. 26 of 41; *see also* doc. # 139 at p. 2 of 41 (indicating no medical restrictions on April 17, 2006). Mr. Lucero has not demonstrated that anyone at MCDF received notice of his housing restriction to the first tier. Mr. Lucero has not shown any genuine issues of fact about these alleged violations.[3]

In sum, Mr. Lucero has not shown that double-celling or any other conditions he alleges during his time at MCDF violated the Eighth Amendment prohibition against cruel and unusual punishment.

---

[3]    Regarding Mr. Lucero's allegation that his housing and medical restrictions were violated, he has not alleged that he suffered any physical injury, which is a requirement for an inmate to bring a federal claim for monetary damages. *See* 42 U.S.C. § 1997e(e) ("No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury."). "[A]lthough claims for mental and emotional distress can be brought pursuant to § 1983, . . . § 1997e(e) provides that ‹such a suit cannot stand unless the plaintiff has suffered a physical injury in addition to mental or emotional harms.'" *Turner v. Schultz*, 130 F. Supp. 2d 1216, 1222-23 (D. Colo. 2001) (quoting *Perkins v. Kansas Dept. Corrections*, 165 F.3d 803, 807 (10th Cir. 1999)). As Mr. Lucero has made no showing of physical injury related to being housed on the second tier or carrying his bedding, Defendants are entitled to summary judgment on any claim for compensatory damages arising out of a claim based on his housing and medical restrictions.

b.    Subjective Component of Eighth Amendment Claim

As to the subjective component of his Eighth Amendment claim, Mr. Lucero has not demonstrated that Defendants Hilkey and Farlow were aware of and disregarded an excessive risk to his health or safety created by double-bunking.

While Mr. Lucero alleges that he notified Deputies Carpenter and Gonzales on April 22, 2006 of the injuries he sustained from falling (*see* doc. 3 138 at p. 7 of 18), the record shows that Officers Carpenter and Gonzales did not have any contact with Mr. Lucero during the relevant time period.  Officer Carpenter was on sick leave and regular days off, working only one day shift, on April 25, 2006.  (*See* Affidavit of Steve Farlow (doc. # 119-2) at p. 6 of 11)).  Officer Carpenter was on light duty with no contact with prisoners on April 25, 2006.  (*See* Affidavit of Steve Farlow (doc. # 119-2) at p. 6 of 11).  Officer Gonzales was assigned to the night shift in other pods on April 21, 22, 23, and 26, 2006 and his regular days off were April 19 and 20, 2006  (*See* Affidavit of Steve Farlow (doc. # 119-2) at pp. 6-7 of 11).

While Mr. Lucero represents that he submitted "kites" (*see* doc. # 139 at p. 29 of 41), the record shows no "kites" submitted by Mr. Lucero while he was at MCDF.  (*See* Affidavit of Steve Farlow (doc. # 119-2) at p. 7 of 11; Affidavit of Susan Grimsby (doc. # 140-2) at pp. 1-2 of 2; Affidavit of Craig Miller (doc. # 140-3) at pp. 1-2 of 3).  The documents submitted by Mr. Lucero to demonstrate he filed "kites" at MCDF are all dated after Mr. Lucero returned to SCF.  (*See* doc. # 139 at pp. 31-35 of 41; *see also* doc. # 3 at pp. 19-23 of 26 (grievances concerning MCDF filed at SCF on May 1, 2006); doc. # 3 at pp. 24-26 of 26 (mailings to MCDF in May and June of 2006)).  Defendant Hilkey acknowledges receipt of a letter from Mr. Lucero dated June 15, 2006, approximately six weeks after Mr. Lucero returned to SCF.  (*See* doc. # 139 at p. 31 of 41).

The first record of Mr. Lucero seeking any medical treatment for his alleged injuries

13

was on June 30, 2006, two months after his return to SCF. (*See* doc. # 119-9 at pp. 1-2 of 2; *see also* doc. # 139 at p. 25 of 41 (Mr. Lucero sought medical treatment on July 11, 2006 at SCF); doc. # 119-7 (Mr. Lucero admits he did not mention his injured knee to anyone at DRDC)). Thus, Defendants Hilkey and Farlow were not aware that double-bunking caused Mr. Lucero to require any medical treatment.

Mr. Lucero submits the affidavits of former inmates Johnny Oxenford, Manuel Sepulveda, Deitrich Franz Bostelman, and Scott Bradley that they complained to MCDF personnel about falls and injuries they incurred "while attempting to pass through the narrow gap between the two beds within the cell . . . ." (*See* doc. # 139 at p. 27 of 4; *see also* doc. # 139 at pp. 36-38, 40 of 41). Defendants have presented evidence that no "kites" or incident reports were filed regarding any injuries sustained or complaints made by inmates Oxenford, Sepulveda, Bostelman, or Bradley. (*See* Affidavit of Craig Miller (doc. # 140-3) at pp. 2-3 of 3; doc. # 140-4 at p. 2 of 4). Inmates Oxenford's, Sepulveda's, Bostelman's, and Bradley's affidavits do not indicate specific dates that they complained of falls caused by double-bunking. (*See, e.g.*, doc. # 139 at p. 40 of 41 ("I often complained to staff about my injuries . . .")). Defendants have pointed to specific portions of the record that demonstrate an absence of a genuine issue of material fact as to deliberate indifference. (*See* Affidavit of Steve Farlow (doc. # 119-2) at p. 5 of 11; (doc. # 140-2) at pp. 1-2 of 4) (there have been no reported incidents of injuries to prisoners resulting from double-bunking at MCDF); doc. # 140-4 at p. 2 of 4). Mr. Lucero has not come forward with sufficiently specific facts to show a genuine issue as to the elements of a claim for deliberate indifference.

Mr. Lucero has failed to demonstrate that Defendants Hilkey and Farlow knew that double-bunking would cause him to fall in his cell and hurt himself. Mr. Lucero's conclusory allegations are insufficient to support a claim of deliberate indifference. There simply is not sufficient evidence in the record to show that Defendants knew that Mr.

Lucero faced a substantial risk of serious harm and disregarded that risk by failing to take reasonable measures to abate it. Defendants are entitled to summary judgment on Mr. Lucero's Claim One.

### 3. Mr. Lucero's Claims Two and Three

In Claims Two and Three, Mr. Lucero alleges that he was subjected to inadequate ventilation, carbon monoxide, and excessive heat while riding in a Sheriff's van from MCDF to CDOC's Denver Reception and Diagnostic Center ("DRDC") on April 26, 2006. (*See* doc. # 3 at pp. 9-12 of 26; doc. # 142 at pp. 1-3 of 13). Mr. Lucero names only Defendants Westermeyer, McCabe, and Hilkey in this claim. Mr. Lucero has summarized these claims:

> I was transported from the Mesa County Detention Facility to the Denver Reception and Diagnostic Center on April 26, 2006 by Sheriff Deputies – Jim Westermeyer and Kevin McCabe, while I was shackled and handcuffed and placed in a 5' x 7' space with 7 other male inmates for nearly 4 hours. The space in the van had no air in light of having no windows or vents, as the air duct did not function. Carbon monoxide rose through the floor of the van making me very ill, along with all other 7 male inmates. We mentioned the problem to both Sheriff Deputies and they said that the Mesa County Sheriff's Office was well [sic] of the problem for a long time due to complaints from other inmates and transportation officers. No corrective action was taken and upon arrival at DRDC, I was treated on an emergency basis for carbon monoxide poisoning. I suffered severe physical trauma in light of the deliberate indifference by Defendants -- Jim Westermeyer, Kevin McCabe, Stanley Hilkey and the Mesa County Sheriff's office.

(doc. # 3 at p. 4 of 26).

> During the first 30 miles of the approximate 300-mile trip, the rear portion of the van quickly became extremely hot and intolerable, due to the lack of air and oxygen because the blower fan was not functioning.

(doc. # 142 at p. 1 of 13).

### a. Objective Component of Eighth Amendment Claim

Involuntary exposure to an environment which may cause disease or death may be violative of the Eighth Amendment. *Hoptowit v. Spellman*, 753 F.2d 779, 784 (9th Cir. 1985) (lack of adequate ventilation and air flow "undermine[d] the health of inmates and

the sanitation of the penitentiary").  If the inadequate ventilation and excessive heat subjected Mr. Lucero to an unreasonable risk of serious damage to his health, then his claims may rise beyond mere discomfort and become punishment cognizable under the Eighth Amendment.  *Avery v. Powell*, 695 F. Supp. 632, 636-37 (D.N.H. 1988).  As to the objective component of his Eighth Amendment claim, the court determines that Mr. Lucero has not demonstrated deprivation "of the minimal measure of life's necessities."

On April 26, 2006, Mr. Lucero was transported from MCDF to DRDC by Defendants Deputies Westermire and McCabe in a van operated by the Mesa County Sheriff's Office. (*See* doc. # 3 at p. 4 of 26).  One female prisoner rode in the front compartment of the van and seven male prisoners rode in the rear compartment.  (*See* Affidavit of Kevin McCabe (doc. # 119-3) at p. 2 of 4; Affidavit of Jim Westermire (doc. # 119-5) at p. 2 of 4).  The van made two stops during the trip, one at Eagle, Colorado and one at the Jefferson County Detention Center ("JCDC") in Golden, Colorado.  (*See* Affidavit of Kevin McCabe (doc. # 119-3) at p. 3 of 4; Affidavit of Jim Westermire (doc. # 119-5) at p. 2-3 of 4).  All of the prisoners were removed from the van at both stops.  (*See* Affidavit of Kevin McCabe (doc. # 119-3) at p. 3 of 4; Affidavit of Jim Westermire (doc. # 119-5) at p. 3 of 4).  The entire trip from MCDF to DRDC on April 26, 2006 took less than five hours, including two stops. (*See* doc. # 3 at pp. 9,11 of 26 (alleging departure at 5:30 a.m. and arrival at 10:30 a.m.); doc. # 142 at pp. 1-2 of 13 (same); doc. # 157 at p. 19 of 20 (approximately four hours)).

Approximately 10 miles west of Eagle, the prisoners in the rear compartment began pounding on the walls, rocking the van, and complaining that it was hot in the rear compartment.  (*See* Affidavit of Kevin McCabe (doc. # 119-3) at p. 2 of 4; Affidavit of Jim Westermire (doc. # 119-5) at p. 2 of 4).  One of the prisoners covered the rear security camera with a shirt to gain the Deputies' attention.  (*See id.*; doc. # 138 at p. 4 of 18).  The Deputies warned the prisoners to stop rocking the van and to remove the shirt from the

camera. (*See* Affidavit of Kevin McCabe (doc. # 119-3) at p. 3 of 4; Affidavit of Jim Westermire (doc. # 119-5) at p. 2 of 4). When the prisoners did not comply, the Deputies shut off the fans to the rear compartment. (*See id.*). Security concerns prevented the Deputies from immediately stopping the van on the side of the road. (*See* Affidavit of Kevin McCabe (doc. # 119-3) at p. 3 of 4; Affidavit of Jim Westermire (doc. # 119-5) at p. 2 of 4). When told the van was within 10 to 15 minutes of the Eagle stop, the prisoners calmed down and the shirt was removed from the camera. (*See id.*).

After departing Eagle, the Deputies opened the windows in the front of the van and set the air conditioning at the maximum level in an attempt to "force cool air into the rear compartment." (*See* Affidavit of Kevin McCabe (doc. # 119-3) at p. 3 of 4; Affidavit of Jim Westermire (doc. # 119-5) at pp. 2-3 of 4). The prisoners made no complaints between Eagle and JCDC and the remainder of the trip to DRDC "was uneventful." (*See* Affidavit of Kevin McCabe (doc. # 119-3) at p. 4 of 4; Affidavit of Jim Westermire (doc. # 119-5) at p. 3 of 4). Two of the male prisoners were dropped off at JCDC and the van proceeded to DRDC. (*See* Affidavit of Kevin McCabe (doc. # 119-3) at pp. 3-4 of 4; Affidavit of Jim Westermire (doc. # 119-5) at p. 3 of 4). Mr. Lucero and the remaining prisoners were dropped off at DRDC and taken into custody by DRDC officers. (*See id.*).

Upon arrival at DRDC, Mr. Lucero was examined for his complaint of carbon monoxide poisoning. (*See* doc. # 119-8 at pp. 1-2 of 2). Mr. Lucero complained of "aching bones, burping a gas taste (like petroleum)" and nausea. (*See* doc. # 119-8 at p. 2 of 2). Mr. Lucero reported to the nurse at DRDC no vomiting, no difficulty breathing, and no symptoms of heat. (*See id.*). The medical examination revealed a normal body temperature, that Mr. Lucero's blood was 97% oxygen saturated, and that none of Mr. Lucero's symptoms were consistent with carbon monoxide poisoning. (*See* doc. # 119-8 at p. 1 of 2). Mr. Lucero next sought medical treatment on June 30, 2006, two months after his return to SCF, because his left hip "popped." (*See* doc. # 119-9 at pp. 1-2 of 2).

In support of his claim, Mr. Lucero submits his affidavit and the affidavits of inmates Donald Roderick, Paul Eugene Inman, Bryan Lemay, and Scott Bradley. (*See* doc. # 139 at pp. 9-12, 16, 29-30, 40-41 of 41). These affidavits may not properly be used to defeat Defendants' summary judgment motion.

Affidavits considered in summary judgment motions must "be based on personal knowledge, contain facts which would be admissible at trial, and show that the affiant is competent to testify on the matters stated therein." *Conaway*, 853 F.2d at 792. The trip described by Scott Bradley (*see* doc. # 139 at p. 41 of 41) was on June 23, 2006, not June 16, 2006. (*See* doc. # 140-8 at pp. 1-3 of 3). Mr. Bradley was not transported in a Mesa County van, but was transported by a Rio Blanco County officer or officers for Moffat County. (*See* doc. # 140-8 at pp. 1-3 of 3). Mr. Bradley's affidavit is not admissible or probative of Mr. Lucero's Claims Two and Three.

The affidavit of Bryan Lemay indicates that he observed Mr. Lucero vomiting on April 26, 2006. (*See* doc. # 139 at p. 16 of 41). Mr. Lemay's mere observation of vomiting is not probative of Mr. Lucero's Eighth Amendment claim. Mr. Roderick's and Mr. Inman's almost identical affidavits indicate that the PTU "became extremely hot and intolerable due to the lack of air and oxygen, compounded by the continuous flow of carbon monoxide that entered . . . ." (*See* doc. # 139 at pp. 9, 11 of 41). "[I]nferences and opinions must be grounded in observation or other first-had personal experience. They must not be flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from that experience." *Visser v. Packer Engineering Assoc.*, 924 F.2d 655, 659 (7th Cir.1991). Mr. Roderick's and Mr. Inman's conclusory allegation that carbon monoxide entered the PTU, without any evidence, cannot defeat Defendants' summary judgment motion.

Mr. Lucero's affidavit also indicates "that the rear compartment of the transport van was extremely hot and intolerable." (*See* doc. # 139 at pp. 29-30 of 41). It is not disputed that the PTU became hot and intolerable. Even taken in the light most favorable to Mr.

Lucero, the evidence shows that he experienced a hot and stuffy ride in a van for less than five hours, including two stops.[4] The hot and intolerable conditions that Mr. Lucero alleges do not rise to the serious level implicating a violation of his Eighth Amendment rights. *See McKinney*, 509 U.S. at 36 (allegations were not sufficient to show exposure "to a risk that is so grave that it violates contemporary standards of decency"); *Miller v. Glanz*, 948 F.2d 1562, 1569-70 (10th Cir. 1991) (dismissing claim based on handcuffing prisoner "in an awkward position for almost two hours did not cause the severe pain or lasting injury required to amount to an Eighth Amendment violation"); *Jones v. Goord*, 435 F. Supp. 2d 221, 236 (S.D.N.Y. 2006) (summary judgment is appropriate where facts alleged by plaintiffs, taken as true, fail to rise to a sufficient level of seriousness as a matter of law).

Mr. Lucero alleges that the van's ventilation was inadequate, malfunctioning, or improperly installed, but he presents only conclusory allegations and no evidence to support these allegations. The van used to transport the prisoners was a 2005 Ford E-350 XL Superduty 15-passenger van with a factory-installed rear heat/air conditioning unit. (*See* Affidavit of Steven W. Bell (doc. # 119-4) at p. 2 of 10). The rear ventilation is operated by switches on the main control panel in the driver's compartment. (Affidavit of Steven W. Bell (doc. # 119-4) at p. 4 of 10). The van was converted for prisoner transport by removing the seats behind the driver and front passenger seats. (*See* Affidavit of Steven W. Bell (doc. # 119-4) at p. 2 of 10). The conversion of the van was completed by installing a prisoner transport unit ("PTU") manufactured by Mavron, Inc. (*See* Affidavit of Steven W. Bell (doc. # 119-4) at p. 2 of 10; *see also generally* pp. 5-6 of 10). The PTU has built-in bench seating. (*See* Affidavit of Steven W. Bell (doc. # 119-4) at p. 2 of 10). The PTU is shipped assembled. (*See* Affidavit of Steven W. Bell (doc. # 119-4) at p. 3 of 10).

There is a lengthwise seam in center of roof of the PTU, where the sides/roof halves join. Bolts must be removed from this joint . . . so the sides will fold

---

[4] None of the affidavits presented by Mr. Lucero mention the two stops during which the prisoners were removed from the van.

in to fit the PTU into the rear of the van. Other than this bolted joint, all other joints and corners not related to the doors are welded and/or bolted at the factory and not disturbed in the installation process. . . . the Ford factory floor matting was left in place. The original seat mounting bolts were either used for installation of the prisoner transport unit or plugged.

(*See* Affidavit of Steven W. Bell (doc. # 119-4) at p. 3 of 10; *see also* doc. # 138 at pp. 2-3 of 18 (Mr. Lucero "cannot admit or deny that the seat mounting holes were plugged . . .")). "[A]ll non-welded seams were closed by using more tubes of silicone caulking than the two tubes supplied by the manufacturer." (*See* Affidavit of Steven W. Bell (doc. # 119-4) at p. 3 of 10).

The conversion was performed by a mechanic with 28 years of experience and "Master certified in automotive and truck repair, including certification in the areas of heating, air conditioning and exhaust." (*See* Affidavit of Steven W. Bell (doc. # 119-4) at p. 1 of 10; Affidavit of Steven W. Bell (doc. # 140-6) at p. 1 of 4; *see also* doc. # 138 at p. 3 of 18 (Mr. Lucero "cannot admit or deny that this conversion actually occurred")). The conversion was performed in accordance with the manufacturer's installation instructions. (*See* Affidavit of Steven W. Bell (doc. # 119-4) at pp. 3, 7-10 of 10). A manufacturer-supplied odor fan listed in the "packing list as Standard Blower: (1) Pro Air" and its necessary components were received and installed in accordance with the manufacturer's instructions. (*See* Affidavit of Steven W. Bell (doc. # 119-4) at p. 4 of 10; *see also* doc. # 119-4 at p. 7 of 10; Affidavit of Steven W. Bell doc. # 140-6 at p. 2 of 4 (despite being crossed out on doc. # 119-4 at p. 7 of 10, the blower was installed by Mr. Bell)).

The van's factory-installed rear heat/air conditioning unit was left in place and operates on internal recirculated air, not depending upon air drawn from outside the vehicle. (*See* Affidavit of Steven W. Bell (doc. # 119-4) at p. 2 of 10; *see also* doc. # 138 at p. 1 of 18 (Mr. Lucero "cannot admit or deny . . . whether the transport van had a factory-installed rea[r] heat/air conditioning unit")). The factory rear heat/air

conditioning unit was connected to the manufacturer-supplied tubes, Y's, and vents in the PTU to bring conditioned air into the PTU. (*See* Affidavit of Steven W. Bell (doc. # 119-4) at p. 3 of 10). Four vents in the PTU ceiling bring conditioned air into the PTU. (*See* Affidavit of Steven W. Bell (doc. # 119-4) at p. 3 of 10). At the bottom of the PTU doors is a ventilation opening that allows air from the vents to exit the PTU, creating circulation. (*See* Affidavit of Steven W. Bell (doc. # 119-4) at p. 4 of 10). The Standard Blower is located in the right rear corner of the van interior. (*See id.*). The fan is designed to draw air from the space between the PTU and the interior of the van and discharge it outside the van. (*See* Affidavit of Steven W. Bell (doc. # 119-4) at p. 4 of 10). Mr. Lucero "cannot admit or deny that the PTU had additional ventilation . . . ." (*See* doc. # 138 at p. 3 of 18).

Mr. Lucero argues that "the air from the outside wasn't entering the rear compartment of the transport van because of the plexiglass shield and metal wall that separated the female prisoner and the male prisoners was preventing the air from entering the rear compartment of the transport van." (*See* doc. # 139 at pp. 29-30 of 41). The evidence is to the contrary.

> There is no bulkhead between the driver compartment and the space around the transport unit [rear compartment] which would prevent air from the front of the van from circulating around the exterior of the transport unit. Air from an open window or other source would circulate around the transport unit, but not through it. The circulation fan would pick up air from around the transport unit and exchange air from within the transport unit.

(*See* Affidavit of Steven W. Bell (doc. # 140-6) at p. 2 of 4).

Mr. Lucero argues that repairs performed on the van demonstrate that the ventilation system was inadequate. (*See, e.g.*, doc. # 118 at p. 9 of 18; doc. # 142 at pp. 2-3 of 13; doc. # 157). On or about November 14, 2005, the van was checked pursuant to a Work Order to "Check rear A/C and heat controls." (*See* Fourth Affidavit of Steven W. Bell (doc. # 151-3) at pp. 1-2, 7-8 of 11). At that time, it appeared that the

rear air conditioning and heater controls were working properly. (*See id.* at p. 2 of 11).
On or about December 23, 2005, the van was checked pursuant to a Work Order that
"Kathy Price states that the A/C to the rear passenger compartment is not working . . . ."
(*See* doc. # 142 at p. 7 of 13; doc. # 151-3 at pp. 2-3 of 11).

> Diagnosis of the problem between December 23, 2005 and December 28,
> 2005, showed that the air conditioning for the rear unit was working.
> However, if the van driver turned on the defrost, or turned on heat for the
> driver compartment of the van, . . . hot air would be blown into the
> prisoner transport unit. . . . It would then appear that the air conditioner
> was not working.

(*See* Fourth Affidavit of Steven W. Bell (doc. # 151-3) at p. 3 of 11). This problem was
solved by installation of a valve and a control. (*See id.*).

The record of the December 2005 repairs also indicated "Appears to have a rear
main leak. Needs to go to Ford for warranty repair when Transport can schedule it out
for a few days. Repairs have been deferred for now." (*See* doc. # 142 at p. 7 of 13).
This was a leaking rear main seal on the van engine. (*See* Fourth Affidavit of Steven
W. Bell (doc. # 151-3) at pp. 3-4 of 11) ("The statement that repairs were deferred
pertained only as to the rear main leak, and none of the other statements or problems
indicated on this Work Order," as the "rear main leak did not constitute an immediate
problem of any sort."). The warranty work on the rear main seal leak was performed on
or about January 11, 2006. (*See* Fourth Affidavit of Steven W. Bell (doc. # 151-3) at p.
9 of 11).

No further complaints were made about the heating or cooling system until on or
about May 1, 2006. (*See* doc. # 142 at p. 4 of 13). On or about January 24, 2005, May
19, 2006, May 24, 2006, and August 22, 2006, the van was checked pursuant to Work
Orders for a dead battery. (*See* doc. # 157 at pp. 14-18 of 20). Mr. Lucero does not
allege that these Work Orders related to his claims.

While modifications were made after May 1, 2006, the manufacturer-supplied
odor fan "was in place and was operating when the van was brought in for work in

May." (*See* Statement of Steven W. Bell (doc. # 157) at pp. 12-13 of 20).[5]  No further complaints have been made about the heating or cooling system.  (*See* doc. # 151-3 at p. 5 of 11; doc. # 157 at p. 13 of 20).

A further inspection conducted on May 3, 2007 by Defendants' expert witness confirmed "the exhaust system to be the Ford factory installed system."  (*See* doc. # 119-6 at p. 3 of 6).  The inspection revealed "the exhaust system metal to be in very good condition" and "[n]o actual leaks manifested themselves . . . ."  (*See id.* at p. 4 of 6).  Both exhaust clamps were tight, with no exhaust leak, the welded joints were tight, with no exhaust leak, and no exhaust leaks were found.  (*See* doc. # 119-6 at p. 4 of 6).

> The exhaust system installed on this 2005 Ford E350 XL van is the factory original exhaust system, with no modifications.  The tail pipe ends and exhaust exits the vehicle as designed and as it should.  The components of the exhaust system are in normal condition.  All connections, welded or clamped, are tight, and no exhaust leaks are present.  The exhaust system is in very good condition.

(*See* doc. # 119-6 at p. 5 of 6).

In sum, Mr. Lucero presents nothing more than conclusory allegations that he was exposed to carbon monoxide.  His exposure to the hot interior environment of the van lasted less than five hours, including two stops at which he exited the van.  Viewing all the evidence in the light most favorable to Mr. Lucero, the court concludes that Mr. Lucero was not subjected to an unreasonable risk of serious damage to his health or safety, and thus his claims are not cognizable under the Eighth Amendment.

---

[5]    After receipt of the May 1, 2006 Work Order, Mr. Bell "made shorter, direct runs of duct tubing from the rear heating/air conditioning enclosure to the existing four inlets on the PTU" in order "to provide more direct and increased air flow from the heating/cooling unit to the prisoner transport unit."  (*See* Fourth Affidavit of Steven W. Bell (doc. # 151-3) at p. 5 of 11; doc. # 142 at pp. 4-5 of 13).  Mr. Bell also "added a grate near the front portion of the prisoner transport unit, and installed one RV fan to pull air through the unit" in order "to increase the potential air flow through the PTU." (*See* Fourth Affidavit of Steven W. Bell (doc. # 151-3) at p. 5 of 11).

b.    Subjective Component of Eighth Amendment Claim

As to the subjective component, Mr. Lucero has not demonstrated that Defendants Westermire, McCabe, and Hilkey acted with "deliberate indifference."

Mr. Lucero has not demonstrated that Defendant Hilkey was personally involved in exposing him to the conditions in the van or did so with deliberate indifference to a risk of harm.  There is no evidence that Defendant Hilkey knew of any risk to an inmate related to mechanical problems with a vehicle.  (*See* doc. # 140-4 at p. 1 of 4).  *See Farmer*, 511 U.S. at 837 ("the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference").

Deputy McCabe had previously transported prisoners in the van used on April 26, 2006 and was aware that the rear compartment could become hot and uncomfortable due to body heat when a large number of prisoners were transported. (*See* Affidavit of Kevin McCabe (doc. # 119-3) at p. 2 of 4).  Deputy Westermire had not previously transported prisoners in the van used on April 26, 2006.  (*See* Affidavit of Jim Westermire (doc. # 119-5) at p. 2 of 4).  Mr. Lucero presents no evidence that Defendants Westermire or McCabe were aware of any risks posed to prisoners' health or safety from the ventilation system of the van.  Mr. Lucero indicates that when the prisoners complained of the heat, the Deputies rolled down their windows to get more air into the rear compartment.  (*See* affidavit of Mr. Lucero (doc. # 139) at pp. 29-30 of 41).  This evidence does not show that the Deputies acted with deliberate indifference to Mr. Lucero's health or safety.

Mr. Lucero did not make any request for medical assistance to the Deputies. (*See* Affidavit of Kevin McCabe (doc. # 119-3) at p. 4 of 4;  Affidavit of Jim Westermire (doc. # 119-5) at p. 4 of 4).  While the prisoners complained of being hot and uncomfortable, they did not make any complaints of illness to Deputies McCabe or

Westermire. (*See* Affidavit of Kevin McCabe (doc. # 119-3) at p. 4 of 4). Upon arrival at JCDC, Deputy Westermire observed that Mr. Lucero appeared hot and sweaty but did not appear pale or sick and was walking without difficulty. (*See* Affidavit of Jim Westermire (doc. # 119-5) at p. 3 of 4). Neither of the Deputies observed Mr. Lucero vomiting. (*See* Affidavit of Kevin McCabe (doc. # 119-3) at p. 4 of 4; Affidavit of Jim Westermire (doc. # 119-5) at p. 3 of 4). This evidence does not show that the Deputies acted with deliberate indifference to Mr. Lucero's health or safety.

Mr. Lucero asserts that work orders for the van show that Defendants had "advance knowledge" of problems with the van. (*See, e.g.*, doc. # 138 at p. 4 of 18). Mr. Lucero presents no evidence that Defendants Westermire, McCabe, and Hilkey were aware of any Work Orders regarding the ventilation system of the van. Nor did the Work Orders put anyone on notice of any risk to Mr. Lucero's health or safety. "It is not enough to establish that the official should have known of the risk of harm." *Barney*, 143 F.3d at 1310 (citing *Farmer*, 511 U.S. at 837). "[T]he official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inferences." *Farmer*, 511 U.S. at 837. The evidence in the record shows that mechanical problems with the van were reported and promptly corrected. Without evidence, Mr. Lucero's conclusory allegations that Defendants were deliberately indifferent cannot defeat Defendants' summary judgment motion. (*See, e.g.*, doc. # 139 at pp. 9-12 of 41 (alleging "continuous flow of carbon monoxide")).

4.     Injunctive Relief

Mr. Lucero's transfer back to CDOC from ACDC on April 26, 2006 moots his request for injunctive relief. *See Wirsching v. Colorado*, 360 F.3d 1191, 1196 (10th Cir.

2004) (following release from prison, inmate's claims for declaratory and injunctive relief were moot); *Smith v. Hundley*, 190 F.3d 852, 855 (8th Cir. 1999) (inmate's claims for declaratory and injunctive relief regarding prison conditions were moot when he was transferred to another facility and was no longer subject to those conditions) (citations omitted). An exception to the mootness doctrine is recognized where there is a "reasonable expectation or a demonstrated probability that the same controversy will recur involving the same complaining party." *Murphy v. Hunt*, 455 U.S. 478, 482 (1982)(internal quotation marks and citation omitted).

Mr. Lucero argues that due to his pending Motion for Limited Remand (*see* doc. # 154-2), he may be temporarily returned to MCDF to attend a hearing. Mr. Lucero has the burden of demonstrating this exception to the mootness doctrine. (*See Incumaa v. Ozmint,* 507 F.3d 281, 289 (4th Cir. 2007) (citation omitted). To fall within the exception, a plaintiff must demonstrate that (1) the challenged action was too short in duration to be fully litigated before its cessation or expiration, and (2) there is a reasonable probability that he will be subjected to the same action again. *Spencer v. Kemna*, 523 U.S. 1, 18 (1998). There must be a "demonstrated probability" that the challenged action will recur again, and to the same complainant. *Murphy,* 455 U.S. at 483.

It is purely a matter of speculation whether Mr. Lucero's motion would be granted, whether the state court judge would hold an evidentiary hearing, or whether Mr. Lucero would be held at MCDF again. As there is no reasonable expectation that Mr. Lucero will be subjected to this conduct again, this is not the type of claim to which an exception to the mootness doctrine applies.

5.      Liability of Defendants Hilkey and Farlow in Their Individual Capacities

Mr. Lucero is suing Defendants Hilkey and Farlow in their individual and official

capacities. (*See* doc. # 3 at p. 1 of 26). To the extent that Mr. Lucero is suing Defendants Hilkey and Farlow in their individual capacities, personal capacity suits pursuant to § 1983 seek to impose personal liability upon a government official for actions he or she takes under color of state law. *Kentucky v. Graham*, 473 U.S. 159, 165-67 (1985).

Individual liability under § 1983, regardless of the particular constitutional theory, must be based upon personal responsibility. *See Foote v. Spiegel*, 118 F.3d 1416, 1423-24 (10th Cir. 1997) (individual liability under § 1983 must be based on personal involvement in the alleged constitutional violation) (citation omitted); *Mitchell v. Maynard*, 80 F.3d 1433, 1441 (10th Cir. 1996) (personal participation is an essential allegation in a civil rights action) (citation omitted); *Bennett v. Passic*, 545 F.2d 1260, 1262-63 (10th Cir. 1976) ("Personal participation is an essential allegation in a § 1983 claim."). A defendant may not be held liable merely because of his or her supervisory position. *Grimsley v. MacKay*, 93 F.3d 676, 679 (10th Cir. 1996). There must be an affirmative link between the alleged constitutional violation and the defendant's own participation or failure to supervise. *Butler v. City of Norman*, 992 F.2d 1053, 1055 (10th Cir. 1993). A plaintiff must both allege in the complaint and prove at trial an affirmative link between the alleged constitutional violation and a defendant's participation. *See Stidham v. Peace Officer Standards and Training*, 265 F.3d 1144, 1157 (10th Cir. 2001) (for § 1983 claim, affirmative link between the defendant's conduct and any constitutional violation "must be alleged in the complaint as well as proven at trial").

Defendants Hilkey and Farlow argue that Mr. Lucero has failed to demonstrate that they had any personal participation in or any supervisory liability for the alleged violations of Mr. Lucero's constitutional rights. The court agrees.

Mr. Lucero argues that "Defendant Farlow, as Commander of MCDF," and

"Defendant Hilkey, as Sheriff," were "responsible for MCDF operations to include inmate housing/classification, medical department." (*See* doc. # 138 at pp. 7-8 of 18; *see also* p. 10 of 18 ("As the Mesa County Sheriff, Defendant Hilkey is responsible for the jail. Defendant Farlow was appointed by Defendant Hilkey to administer the jail and is responsible for all jail operations."). Mr. Lucero does not identify any specific action Defendants Hilkey or Farlow took that gave rise to a constitutional violation. Mr. Lucero has not pled that Defendants Hilkey or Farlow personally caused or participated in the alleged constitutional violations. *See McKee v. Heggy*, 703 F.2d 479, 483 (10th Cir. 1983) (an individual cannot be held liable in a section 1983 action unless he "participated or acquiesced" in an alleged constitutional violation). Mr. Lucero has not demonstrated that Defendants Hilkey or Farlow had any direct contact with him, that they were present during any of the conduct alleged, or that they actually knew of and acquiesced in the alleged violations. As Mr. Lucero has failed to establish an affirmative link between the alleged constitutional violations and Defendants Hilkey's and Farlow's participation, there is no basis for holding these Defendants liable in their individual capacities under §1983.

6.    Liability of Defendants Hilkey and Farlow in their Official Capacities

To the extent that Mr. Lucero is suing Defendants Hilkey and Farlow in their official capacities, he is actually attempting to impose liability on Defendant Hilkey as the elected Sheriff of Mesa County, Colorado and as Defendant Farlow's employer. *See Kentucky v. Graham*, 473 U.S. at 166 ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.").

"Municipalities can be sued for monetary, declaratory, or injunctive relief for deprivations of constitutional or civil rights." *Marshall v. Columbia Lea Regional Hospital*, 345 F.3d 1157, 1177 (10th Cir. 2003) (citing *Monell v. Department of Soc.*

28

*Servs.*, 436 U.S. 658, 689-90 (1978) (holding that municipalities and other local governmental bodies are "persons" within the meaning of 42 U.S.C. § 1983)). "A municipality, however, cannot be held liable for the actions of its employees under the theory of *respondeat superior*." *Marshall*, 345 F.3d at 1177 (citation omitted). *See also Lopez v. LeMaster*, 172 F.3d 756, 762-63 (10th Cir. 1999) ("The County may be held liable under 42 U.S.C. § 1983 only for its own unconstitutional or illegal policies and not for the tortious acts of its employees.") (internal quotation marks and citation omitted).

"Plaintiffs seeking to impose liability on a municipality under section 1983 must identify a municipal 'policy' or 'custom' causing their injury." *Marshall*, 345 F.3d at 1177 (citation omitted). *See also Bryan County v. Brown*, 520 U.S. 397, 403 (1997) ("we have required a plaintiff seeking to impose liability on a municipality under § 1983 to identify a municipal 'policy' or 'custom' that caused the plaintiff's injury.") (citations omitted).

> [I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.

*Bryan County*, 520 U.S. at 404.

"An unconstitutional deprivation is caused by a municipal 'policy' if it results from decisions of a duly constituted legislative body or an official whose acts may fairly be said to be those of the municipality itself." *Marshall*, 345 F.3d at 1177 (citation omitted). To warrant liability, the alleged policy must be a "policy statement, ordinance, regulation, or decision officially adopted and promulgated" by the public entity's officers. *Lankford v. City of Hobart*, 73 F.3d 283, 286 (10th Cir. 1996) (internal quotation marks and citation omitted). A decision that "was a 'course of action consciously chosen from among various alternatives' " generally implies a policy. *J.B. v. Washington County*, 127 F.3d 919, 924 (10th Cir. 1997).

"If a violation cannot be characterized as official policy, then [a municipality may] still be held liable if the practice is so permanent and well-settled as to constitute a custom or usage with the force of law." *Lankford*, 73 F.3d at 286 (internal quotation marks and citations omitted). *See also Camfield v. City of Oklahoma City*, 248 F.3d 1214, 1229 (10th Cir. 2001) ("a municipality may be held liable when the illegal practice is so permanent and well settled as to constitute a custom or usage with the force of law") (internal quotation marks and citation omitted). " '[C]ustom' has come to mean an act that, although not formally approved by an appropriate decision maker, has such widespread practice as to have the force of law." *Marshall*, 345 F.3d at 1177 (citation omitted).

Mr. Lucero has not demonstrated an unconstitutional or illegal policy or custom attributable to the County. In the absence of evidence of policy or custom, Mr. Lucero has no claim for supervisory liability against the County *See Myers v. Okla. County Bd. of County Comm'rs*, 151 F.3d 1313, 1318 (10th Cir. 1998) (requiring proof that policy or custom is the moving force behind governmental employee's constitutional violation). Mr. Lucero's claim against Defendants Hilkey and Farlow in their official capacities is not sufficient to survive summary judgment.

7. Qualified Immunity Defense

Defendants raise the defense of qualified immunity. "The doctrine of qualified immunity provides that [w]hen government officials are performing discretionary functions, they will not be held liable for their conduct unless their actions violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mitchell v. Maynard*, 80 F.3d 1433, 1447 (10th Cir. 1996) (internal quotation marks and citations omitted).

Whether Defendants are entitled to qualified immunity is a legal question.

*Wilder v. Turner*, 490 F.3d 810, 813 (10th Cir. 2007).

> When [a defendant] asserts a defense of qualified immunity, the plaintiff bears a heavy two-part burden. Initially, the plaintiff must show the [defendant]'s conduct violated a constitutional right: A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the [defendant]'s conduct violated a constitutional right? If the [defendant]'s conduct did not violate a constitutional right, the inquiry ends and the [defendant] is entitled to qualified immunity.

*Wilder*, 490 F.3d at 813 (internal quotation marks and citations omitted). *See also*

*Wilson v. Layne*, 526 U.S. 603, 609 (1999) (a court evaluating a claim of qualified

immunity "must first determine whether the plaintiff has alleged the deprivation of an

actual constitutional right at all, and if so, proceed to determine whether that right was

clearly established at the time of the alleged violation.") (citation omitted).

As the court has concluded that Mr. Lucero failed to establish a violation of his

constitutional rights, Defendants are entitled to qualified immunity. *See Wilder*, 490

F.3d at 815 (instructing district court on remand to enter judgment in favor of defendant

on basis of qualified immunity, where plaintiff failed to carry his burden to show

violation of a constitutional right).


III.    Mr. Lucero's Motion to Amend

On June 29, 2007, the same date that Defendants filed their first Motion for

Summary Judgment and after discovery was completed, Mr. Lucero moved to amend

his Complaint. (*See* doc. # 117). On September 11, 2007, the court granted Mr.

Lucero's amendment and accepted the operative Amended Complaint (consisting of

docs. # 3 and # 142) for filing. Defendants filed their second Motion for Summary

Judgment on October 5, 2007, directed to Mr. Lucero's amendments. On September

19, 2007, Mr. Lucero again moved to amend.

Motions to amend are committed to the trial court's discretion. *Woolsey v.*

*Marion Laboratories, Inc.*, 934 F.2d 1452, 1462 (10th Cir. 1991). Leave to amend should be freely given based on the balancing of several factors, including futility, delay, bad faith, dilatory motive, repeated failure to cure deficiencies, and prejudice to the opposing party. *Moore v. Reynolds*, 153 F.3d 1086, 1116 (10th Cir. 1998) (citing *Foman v. Davis*, 371 U.S. 178, 181-82 (1962)).

Nevertheless, "[t]he broad permissive language appearing in both the rule and the cases does not mean that there are no standards by which the trial court is to be guided." *Moore v. U.S./U.S. Dept. of Agriculture Forest Service*, 864 F. Supp. 163, 164 (D. Colo. 1994) (internal quotation marks and citation omitted). Although Fed. R. Civ. P. 15(a) requires leave to amend be given freely, that requirement does not apply where an amendment obviously would be futile. *T.V. Communications Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022, 1028 (10th Cir. 1992) (citations omitted). Where a complaint, as amended, would be subject to dismissal, leave to amend need not be granted. *T.V. Communications Network, Inc.*, 964 F.2d at 1028. *See also Lind v. Aetna Health, Inc.*, 466 F.3d 1195, 1199 (10th Cir. 2006) ("A proposed amendment is futile if the complaint, as amended, would be subject to dismissal.") (internal quotation marks and citation omitted); *Sheldon v. Vermonty*, 204 F.R.D. 679, 682 (D. Kan. 2001) (In order to determine whether a proposed amendment is futile, the court must analyze the proposed amendment as if it were before the court on a motion to dismiss pursuant to Fed. R. C. P. 12(b)(6)).

Fed. R. Civ. P. 12(b)(6) empowers the court to dismiss an action "for failure to state a claim upon which relief can be granted." The court "must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff." *Alvarado v. KOB-TV, L.L.C.*, 493 F. 3d 1210, 1215 (10th Cir. 2007) (quoting *David v. City & County of Denver*, 101 F.3d 1344, 1352 (10th Cir. 1996)). The court "look[s] to the specific allegations in the complaint to determine

whether they plausibly support a legal claim for relief." *Alvarado*, 493 F. 3d at 1215 n. 2 (citing *Bell Atlantic Corp. v. Twombly*, --- U.S. ----, ----, 127 S. Ct. 1955, 1968-69 (2007) ("the old standard, 'a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief' is 'best forgotten as an incomplete, negative gloss on an accepted pleading standard'")).

Mr. Lucero seeks to file a Second Amended Complaint to, *inter alia*, "add the Mesa County Commissioners as Defendants to Plaintiff's Prisoner Complaint, whose names are: Tilman M. Bishop, Craig Meis, and Janet Rowland." (*See* doc. # 143 at p. 1 of 5). Mr. Lucero intends to sue the Mesa County Commissioners in their "official capacity, acting individually or in concert." (*See* doc. # 143 at p. 2 of 5). The court concludes that Mr. Lucero's proposed amendment is properly denied as futile.

Under the Colorado constitution and applicable statutes, as the elected Sheriff of Mesa County, Colorado, Defendant Hilkey holds "a distinct position, separate from the Board of County Commissioners." *Gonzales v. Martinez*, 403 F.3d 1179, 1182 n. 7 (10th Cir. 2005) (citation omitted), *cert. denied*, 546 U.S. 1003 (2005). The County Sheriff is treated as a public entity having certain powers and responsibilities. *Tunget v. Board of County Commissioners of Delta County*, 992 P.2d 650, 651-52 (Colo. App. 1999) (citing Colo. Const. art XIV, § 8.5). "[T]he sheriff shall have charge and custody of the jails of the county, and of the prisoners in the jails, and shall supervise them himself or herself or through a deputy or jailer." Colo. Rev. Stat. § 30-10-511. Lucero's claims regarding jail conditions and operations are properly treated as claims against Defendant Hilkey in his official capacity as elected Sheriff.

"Had [Mr. Lucero] claimed the Sheriff set official policy of the County or was following policy established by the County in the operation of the jail," an action might lie against Mesa County, through the Board of County Commissioners. *See Gonzales*,

403 F.3d at 1182 n. 7. ("counties can be held liable for the misdeeds of Sheriffs and their employees when the Sheriff is held to set 'official policy' for the county") (citing *Bristol v. Bd. of County Comm'rs of Clear Creek*, 312 F.3d 1213, 1221 (10th Cir. 2002)). "Under Colo. Rev. Stat. § 30-11-105, 'the name in which the county shall sue or be sued shall be, 'The board of county commissioners of the county of . . . .'" *Gonzales*, 403 F.3d at 1182 n. 7. "This statutory provision provides the exclusive method by which jurisdiction over a county can be obtained." *Gonzales*, 403 F.3d at 1182 n. 7. (quoting *Calahan v. Jefferson County*, 163 Colo. 212, 429 P.2d 301, 302 (1967)).

The County may be held liable under § 1983 "only for its own unconstitutional or illegal policies and not for the tortious acts of its employees." *Lopez*, 172 F.3d at 762-63 (internal quotation marks and citation omitted). *See also Marshall*, 345 F.3d at 1177 (a municipality or other local government body "cannot be held liable for the actions of its employees under the theory of *respondeat superior*.") (citation omitted).

First, Mr. Lucero has not alleged or established that Defendant Hilkey set official policy of the County or was following policy established by the County in the operation of the jail. While "the board of county commissioners of each county has the exclusive power to adopt the annual budget for the operation of the county government," *see* Colo. Rev. Stat. § 30-11-107(2)(a), this budgetary authority does not make county commissioners responsible for any of the policies of a sheriff. As the board of county commissioners is not the employer of and does not exercise control over the sheriff, the commissioners may not be liable in their official capacities for the policies of the jail.[6]

Second, the County may not be held liable under § 1983 through suing the

---

[6]     Mr. Lucero has stated that "the implementation of the Stack-a-Bunk" has "been ongoing since 1992 or 1993" and "existed long before Defendant Hilkey was elected Sheriff on or about 2003." (*See* doc. # 143 at p. 2 of 5). Upon information and belief, Commissioner Bishop also took office in 2003 and Commissioners Rowland and Meis took office two years later. According to Mr. Lucero's own allegations, the proposed additional Defendants could not be responsible for the decision to use "Stack-a-Bunk[s]." Further, Tilman M. Bishop is no longer a County Commissioner.

individual Commissioners. "A county exercises its power by and through its board of commissioners, not through individual members." *Nicholl v. E-470 Public Highway Authority*, 896 P.2d 859, 866 (Colo. 1995) (citing Colo. Rev. Stat. § 30-11-103). Nor has Mr. Lucero alleged any affirmative link between the individual Commissioners' conduct and any constitutional violation. *See Stidham*, 265 F.3d at 1157 (for § 1983 claim, affirmative link between the defendant's conduct and any constitutional violation "must be alleged in the complaint as well as proven at trial"). Mr. Lucero does not state a claim against the Commissioners in their individual capacities.

Further, Mr. Lucero's failure to demonstrate a valid claim for violation of his constitutional rights based on the conditions at MCDF forecloses his proposed amendment. Because Mr. Lucero fails to establish a valid claim, this action cannot lie against the Commissioners. Mr. Lucero has not alleged that the Commissioners knew of any problems caused by portable beds at the jail. Thus, Mr. Lucero fails to state a claim under § 1983 that the Commissioners knew of a substantial risk of harm and disregarded that risk.

IV.     Conclusion

Accordingly, IT IS RECOMMENDED that:

1.      "Defendants' Motion for Summary Judgment" (filed June 29, 2007) (doc. # 118) be GRANTED;

2.      "Defendants' Motion for Summary Judgment Against Amended Prisoner Complaint" (filed October 5, 2007) (doc. # 150) be GRANTED;

3.      Plaintiff Lucero's "Motion to Amend Prisoner Complaint" (filed September 19, 2007) (doc. # 143) be DENIED; and

4.      Summary judgment enter in favor of Defendants and against Plaintiff on all claims in this civil action.

Further, IT IS ORDERED that "Plaintiff's Motion to Supplement Legal Authority Regarding Plaintiff's Verified Response to Motion for Summary Judgment" (filed September 19, 2007) (doc. # 144) is GRANTED.


**Advisement to the Parties**

Within ten days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995). A general objection that does not put the District Court on notice of the basis for the objection will not preserve the objection for *de novo* review. "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. One Parcel of Real Property Known As 2121 East 30th Street, Tulsa, Oklahoma*, 73 F.3d 1057, 1060 (10th Cir. 1996). Failure to make timely objections may bar *de novo* review by the District Judge of the Magistrate Judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the magistrate judge. *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (District Court's decision to review a Magistrate Judge's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule"); *One Parcel of Real Property*, 73 F.3d at 1059-60 (a party's objections to the Magistrate Judge's report and recommendation must be both timely and specific to preserve an issue for *de novo* review by the District Court or for appellate review); *International Surplus Lines Insurance Co. v. Wyoming Coal Refining Systems, Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to certain portions

of the Magistrate Judge's order, cross-claimant had waived its right to appeal those portions of the ruling);  *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to appeal the Magistrate Judge's ruling).  *But see, Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).

DATED at Denver, Colorado, this 31st day of January, 2008.

BY THE COURT:

_____s/Craig B. Shaffer_____
United States Magistrate Judge